# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Case No. 8:08CV235 |
| vs. | ) |
| | ) |
| TWO HUNDRED THIRTY ONE | ) |
| THOUSAND NINE HUNDRED | ) |
| THIRTY DOLLARS ($231,930.00) | ) |
| IN UNITED STATES CURRENCY | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____/ | ) |
| | ) |
| BARTOSZ MAREK KUPCZYK, | ) |
| | ) |
| Claimant. | ) |
| | ) |
| _____/ | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CLAIMANT'S MOTION TO SUPRESS EVIDENCE

# TABLE OF CONTENTS

Page

STATEMENT OF FACTS ...................................................................................... 1

ARGUMENT ......................................................................................................... 3

I. CLAIMANT HAS STANDING TO CHALLENGE
THE TRAFFIC STOP, THE DETENTION OF HIS PERSON,
AND THE SEARCH OF HIS VEHICLE AND HIS LUGGAGE THEREIN ................... 3

II. CLAIMANT'S FOURTH AMENDMENT RIGHTS WERE VIOLATED
BY THE WARRANTLESS SEARCH AND SEIZURE BY DEPUTIES ........................ 4

A. The Traffic Stop Constitutes an Illegal Detention ................................................. 5

B. Deputies Illegally Expanded the Traffic Stop
Without Reasonable Suspicion and Illegally Seized Claimant
After Issuing A Warning For Speeding ...................................................................... 9

1. Deputies Had No Reasonable Suspicion
to Prolong the Detention of Claimant .................................................................. 9

2. A Reasonable Person Would Not Have Felt Free To Leave
and Ignore the Police Presence After Deputy Vance
Handed Claimant A Warning For Speeding ...................................................... 12

C. Any Consent By Claimant To Search The Vehicle
Was Not Freely and Voluntarily Given and
Does Not Validate the Warrantless Search of Claimant's Luggage ........................... 15

1. Claimant's Consent To Search the Vehicle
Was Not Freely and Voluntarily Given .............................................................. 17

2. Officers Never Requested Nor Obtained Consent
To Search Claimant's Luggage .......................................................................... 22

3. Assuming, Arguendo, that Claimant's Consent Was Voluntary
and Encompassed the Search of His Luggage, the Search
and Evidence Obtained Was Tainted by His Subsequent Illegal Detention ......... 23

III. DEPUTIES UNLAWFULLY ARRESTED CLAIMANT
IN VIOLATION OF THE FIFTH AMENDMENT.......................................................26

IV. ALL EVIDENCE OBTAINED AS A RESULT OF AN UNLAWFUL
WARRANTLESS SEARCH IS THE "FRUIT OF THE POISONOUS TREE"
AND VIOLATED THE FIFTH AMENDMENT; AND MUST BE SUPPRESSED.......27

CONCLUSION ..............................................................................................................28

CERTIFICATE OF SERVICE .....................................................................................29

## STATEMENT OF FACTS[1]

On February 4, 2008, claimant Bartosz Marek Kupczyk ("Claimant") was driving Westbound on I-80, approximately 20 miles West of Lincoln, Nebraska, in a vehicle rented under his own name. See *Exhibit C*. Seward County Sheriff's Deputy Randy Brown ("Deputy Brown") was patrolling that stretch of interstate, noticed Claimant's vehicle and drove his patrol vehicle along side of Claimant's rental vehicle for approximately 15-20 seconds, Claimant became uneasy as a result of Deputy Brown's action, and briefly looked over at Deputy Brown. *Exhibit A: 5*. Deputy Brown was pointing a camera-phone type of device toward Claimant and/or his rental vehicle, and upon seeing Claimant look over, put the device away and sped off ahead of Claimant. *Id.*

Claimant passed another marked patrol vehicle that was parked in the center median of the interstate, and then passed a marked Seward County Sheriff's vehicle driven by Deputy Mike Vance ("Deputy Vance"). *Id.* at 6-7; *Exhibit B*. Deputy Vance, who was accompanied by Deputy Jenny Vance ("Deputy J. Vance"), initiated a traffic stop on Claimant. *Id.* Both uniformed and armed deputies exited the patrol vehicle. Deputy Vance conversed with Claimant, then went back to his patrol vehicle and reviewed Claimant's rental agreement (which showed that the vehicle was rented to Claimant) and ran a check on Claimant's driver's license (which came back clear), while Deputy J. Vance monitored Claimant from the right shoulder of the interstate. See *Exhibit A*: 3; *Exhibit B*. Deputy Vance then ordered Claimant out of his rental vehicle and in front of his

---

[1] The facts are derived from Claimant's Declaration of Fact (filed with Claimant's index of evidence in support of the present motion and referred to as *Exhibit A* - number references are to paragraph numbers), the audio/video of the incident (*Exhibit B*), and the rental agreement.

1

patrol vehicle on a cold and windy day. *Exhibit A*: 10. By this time, Deputy Brown, uniformed and armed, also arrived at the scene. *Exhibit A: 11*; *Exhibit B*.

While Deputy Vance obtained the vehicle VIN number, Deputy Brown interrogated Claimant about his travel itinerary. *Exhibit A*: 12. All three deputies then closely surrounded Claimant. *Id.*

Deputy Vance told Claimant that he must sign a speeding warning, Claimant complied, and was asked if he would mind answering a few more questions. Claimant agreed and, in response to questioning, told Deputy Vance that he was not carrying illegal narcotics, firearms, or large amounts of U.S. currency. *Id.* at 13. Deputy Vance immediately asked if Claimant minded if the deputies searched the rental vehicle. Claimant hesitated, and then shrugged his shoulders while telling Deputy Vance "I guess that's fine." *Id.* at 13; *Exhibit B*. Deputy Vance immediately ordered Claimant further away from the vehicle, whereupon Deputy J. Vance forcefully handcuffed Claimant and put him in the back seat of Deputy Vance's patrol vehicle. *Exhibit A*: 14. Claimant was not ever advised of his right to refuse officers' requests and was not Mirandized. *Id.* at 11. Deputies Vance and Brown then searched the trunk of Claimant's rental vehicle and searched through Claimant's personal belongings within his luggage. *Id.* at 14-18.

The search eventually revealed the defendant currency. Deputies then transported Claimant to the sheriff's office where his belongings were taken, and he was placed in a holding cell for approximately an hour. *Id.* at 16-17. Deputies brought Claimant to an office and interrogated him further. *Id.*

2

After approximately four and half hours of being in custody (since the time of the traffic stop), Claimant was finally released without ever having been charged with any crime and without ever being advised of his rights under *Miranda*. *Id. at* 18.

## ARGUMENT

The Fourth Amendment of the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Claimant was detained and his vehicle and luggage were searched without a warrant, and in violation of the Fourth Amendment of the Constitution. Additionally, Claimant was unlawfully arrested and held for over four hours without ever having been advised of his rights or charged with a crime, in violation of his rights under the Fifth Amendment of the Constitution. All evidence obtained as a result of the unlawful search, seizure, and arrest of Claimant should be suppressed in the instant matter.

## I.   CLAIMANT HAS STANDING TO CHALLENGE THE TRAFFIC STOP, THE DETENTION OF HIS PERSON, AND THE SEARCH OF HIS VEHICLE AND HIS LUGGAGE THEREIN

In order for a citizen to have standing to challenge a search on Fourth Amendment grounds, a citizen must show that under the totality of the circumstances he had a legitimate expectation of privacy in the particular place searched or object seized. *See e.g.*, *Rakas v. Illinois*, 439 U.S. 128 (1979). A person who has a property **or possessory** interest in the place searched or the items seized, has a legitimate expectation of privacy sufficient to invoke the Fourth Amendment's protections to be free from unreasonable searches and seizures. *See, e.g.*, *Rakas*, 439 U.S. at 148; *United States v. Padilla*, 508 U.S. 77 (1993).

3

In the instant case, Claimant clearly has a sufficient expectation of privacy to assert a violation of his Fourth Amendment rights where he was the driver and custodian of the vehicle that was stopped, he was the person that was stopped, seized, and arrested, and he was clearly the possessor and owner of the luggage that was searched.

## II.    CLAIMANT'S FOURTH AMENDMENT RIGHTS WERE VIOLATED BY THE WARRANTLESS SEARCH AND SEIZURE BY DEPUTIES

It has long been hornbook law that the Fourth Amendment embodies a strong preference for search warrants. See e.g. *Terry v. Ohio*, 392 U.S. 1, 20 (1968) ("police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure.")  In *United States v. Lefkowitz*, 285 U.S. 452, 464 (1932), the Supreme Court stated:

> ". . . the informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers and others who may happen to make arrests. Security against unlawful searches is more likely to be attained by resort to search warrants than by reliance upon the caution and sagacity of petty officers while acting under the excitement that attends the capture of persons accused of crime. . . ."

> *Id.*

> It is a cardinal rule that in seizing goods and articles, law enforcement agents must secure and use warrants whenever reasonably practicable.... (citations omitted.)  This rule rests upon the desirability of having magistrates rather than peace officers determine when searches and seizures are permissible and what limitations should be placed on such activities.  (Citations omitted.)  In their understandable zeal to ferret out crime and in the excitement of the capture of suspected persons, officers are less likely to possess the detachment and neutrality with which constitutional rights of the suspect must be viewed.

> *Trupiano v. United States*, 334 U.S. 699, 705 (1948) (overruled on other grounds, 399 U.S. 56, 66 (1950))

4

Although warrantless searches are not absolutely prohibited, deviating from the warrant requirement must be done only in "exceptional" circumstances (See *Johnson v. United States*, 333 U.S. 10, 13-15 (1948)) and exceptions to the warrant requirement are "jealously and carefully drawn." See *United States v. Carbajal*, 956 F.2d 924, 930 (9th Cir. 1992), *cert. denied*, 510 U.S. 900 (1993). "The touchstone of the Fourth Amendment is reasonableness ... **Warrantless searches are per se unreasonable unless the search falls within one of "a few specifically established and well-delineated exceptions."** *Katz v. United States*, 389 U.S. 347, 357 (1967). Thus, the government always, and Plaintiff here, bears the burden of establishing that a warrantless search and seizure was reasonable and not violative of the Fourth Amendment. See, e.g., *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971). The Fourth Amendment violations in the present case will be discussed and addressed chronologically.

### A.    The Traffic Stop Constitutes an Illegal Detention

The *Fourth Amendment* "protects two types of expectations, one involving 'searches,' the other 'seizures,'" *United States v. Jacobsen*, 466 U.S. 109, 121 (1984), and requires that both be reasonable. *City of Indianapolis v. Edmond*, 531 U.S. 32, 36 (2000). The temporary detention of an individual during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, is a "seizure" of a "person" within the meaning of the Fourth Amendment. *Whren v. United States, 517 U.S. 806, 809 (1996).*

Whether a seizure is reasonable is a question of law, (*See Muehler v. Mena*, 544 U.S. 93, 98 n.1 (2005)), and depends on the balance between the public interest and the individual's right

to personal security, free from arbitrary interference by law enforcement officers. (*See Terry v. Ohio,* 392 U.S. 1, 16-19 (1968)).

"A traffic stop generally must be supported by 'at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring.'" *United States v. Martin*, 411 F.3d 998, 1000 (8th Cir. 2005). Pretextual traffic stops are a violation of the Fourth Amendment. See, e.g*., United States v. Portwood*, 857 F.2d 1221, 1223 (8th Cir. 1988), cert. denied, 490 U.S. 1069, 104 L. Ed. 2d 638, 109 S. Ct. 2073 (1989). However, if an officer observes a traffic violation, "he has probable cause to stop the driver of the vehicle." *United States v. Cummins*, 920 F.2d 498, 500 (8th Cir. 1990), cert. denied, 116 L. Ed. 2d 448, 112 S. Ct. 428 (1991). An officer must, therefore, have an objective and reasonable belief that he has observed a traffic offense (or other crime) to legally stop a vehicle. In determining whether a traffic stop was for probable cause or was merely pretextual, a court is to make "an objective assessment of [the] officer's action in light of the facts and circumstances then known to him." *Scott v. United States*, 436 U.S. 128, 137 (1978); see also *United States v. Woodall*, 938 F.2d 834, 837 (8th Cir. 1991).

Plaintiff will not be able to satisfy its burden of showing a justification for the stop in the present case. Claimant disputes that he was speeding when Deputy Vance observed his vehicle and pulled him over.

A fortiori, Deputy Vance's patrol vehicle was the third patrol vehicle that Claimant observed within a short period of time that day. Claimant submits that he was well aware of law enforcement presence when the first patrol car executed a strange and suspicious maneuver by following parallel to Claimant for an extended period of time and pointing some unknown object

6

towards Claimant. At that time, Claimant adjusted his cruise control to be within the speed limit. Claimant observed a second officer and became acutely aware of his speed. Finally, when Claimant passed the third officer, he was still on cruise control and still driving under the posted speed limit. Additionally, Claimant submits that due to the presence of heavy construction on that stretch of interstate, the speed limit kept changing - yet another factor supporting Claimant's contention that he was acutely aware and mindful of the posted speed limit at the time of the stop.

Claimant, in response to any allegation that his vehicle might have swerved in such a way that would justify a traffic stop, denies ever having swerved, but, aside from the fact that Deputy Brown's actions were, at best, distracting to any driver, such an unsuspicious driving factor as minor swerving has been addressed, and found non-persuasive, in other cases. In *United States v. Billups*, 442 F. Supp. 2d 697 (D.Minn. 2006), the court found that "lawful and common actions did not -- either individually or taken together -- give [the trooper] a reasonable, articulable suspicion that the occupants of defendants' car had engaged in or were engaging in criminal activity."

Brief eye contact with Deputy Brown likewise does not justify a seizure. The government, in *Billups,* ironically and notably argued that it was suspicious that the vehicle had tinted windows, was driving slightly below the speed limit, and the driver **did not make eye contact** with a trooper that had passed him (among other factors). *Id*. at 699. The court rejected the latter notion by stating that is was "not clear to the Court why failing to make eye contact with a passing trooper is any more indicative of criminal activity than *making* eye contact." *Id*. (emphasis in original). Even if eye contact with a law enforcement officer were suspicious, the eye contact in

7

the present case was made only after Deputy Brown was driving parallel to Claimant for 15-20 seconds and would not justify a traffic stop.

Additionally, the Court in *Billups* rejected the notion that, after the trooper observed the vehicle weave, circumstances added to or created a legal justification to stop the vehicle:

> [the trooper] observed the car "weaving" in the right lane. Specifically, Trooper Schneider saw the car touch (but not cross) the right fog line once and touch (but not cross) the center dividing line twice. The government argues that this weaving -- when considered together with the other "indicators of criminal behavior" discussed above -- gave Trooper Schneider legal justification to stop defendants' car. In particular, the government argues that the weaving gave Trooper Schneider a reasonable, articulable suspicion that Billups was driving while impaired by alcohol or drugs.

*Id*. at 700

The Court rejected this argument and stated that among the other various reasons that the weaving did not give the trooper the right to stop defendant's car was that the weaving was minor and it was a windy day. See *id. at 700-701* (*"*Even under normal weather conditions, Billups' momentary and minor weaving was as likely to have resulted from daydreaming or adjusting the radio or talking on a cell phone as it was to have resulted from driving while impaired.") Here, the weaving, if it occurred at all, resulted directly from Deputy Brown's bizarre driving maneuver. Moreover, here and as in *Billups*, because the weather here was windy, "as clearly evidenced by the videotape of the stop ... " it could only be expected that drivers might weave slightly, especially under the circumstances of this case.

Because Claimant was not speeding and no other objective reasonable suspicion of criminal activity existed, Deputy Vance had no lawful justification to stop Claimant.

8

**B.      Deputies Illegally Expanded the Traffic Stop Without Reasonable Suspicion and Illegally Seized Claimant After Issuing A Warning For Speeding**

**1.      Deputies Had No Reasonable Suspicion to Prolong the Detention of Claimant**

Deputies did not have a reasonable and articulable suspicion that Claimant was involved in drug trafficking, and could not have lawfully detained Claimant at the time that they handed Claimant a warning citation for speeding.

"An officer may expand the scope of a traffic stop beyond the initial reason for the stop and prolong the detention if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot." *United States v. Loya,* 528 F.3d 546553 (8th Cir. 2008), citing *United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007).

"Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994). "Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person . . . of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417-18 (1981).

Here, deputies clearly had no reasonable suspicion of any criminal activity at the point that Claimant was issued a warning for speeding. The rental agreement was in Claimant's name and he has no criminal history, as the testimony in any hearing on this issue will reveal.  Furthermore, Claimant was merely issued a *warning* citation for speeding.

9

Plaintiff may argue that because Claimant allegedly appeared nervous, than reasonable suspicion for some crime existed.  Claimant denies such nervousness, but, regardless, nervousness alone has been consistently held to not give rise to reasonable suspicion of any crime. In *United States v. Wood, 106 F.3d 942, 947 (10th Cir. 1997)*, a seminal case that has been followed by many circuits, the Tenth Circuit reasoned: "It is certainly not uncommon for most citizens -- whether innocent or guilty -- to exhibit signs of nervousness when confronted by a law enforcement officer". In *United States v. Chavez-Valenzuela*, 2001 U.S. App. LEXIS 28326 (9th Cir. 2001), that Court of Appeals found persuasive the reasoning in *Wood, supra*, and held that nervousness, "even the extreme nervousness Chavez-Valenzuela exhibited here -- in the absence of other particularized, objective factors, does not support a reasonable suspicion of criminal activity ... " *Id. at* *16.

> **We have held consistently that nervousness is "of limited significance" in determining whether reasonable suspicion exists**. See *United States v. Wald,* 216 F.3d 1222, 1227 (10th Cir. 2000) ...  Mr. Williams points to *Wood*, where the panel concluded that the officer's testimony as to the defendant's rapid breathing, trembling hands, and throat-clearing constituted a mere "generic claim of nervousness," and therefore discounted the nervousness as a factor in its reasonable suspicion analysis.
>
> *United States v. Williams*, 271 F.3d 1262, 1268-69 (10th Cir. 2001) (emphases added).

Therefore, the fact the Claimant was nervous cannot establish reasonable suspicion. It is also anticipated that Plaintiff will suggest that Deputy Vance's observation that Claimant did not have food wrappers in his car made him a suspicious traveler because it wound not be normal for a single traveler to travel long distances and not have food wrappers or bags in the vehicle and, on the average, people traveling alone do not eat in restaurants and eat fast food while traveling long

10

distances.  Such an argument would, of course, be absurd. It is ironic that the *Wood* court also considered food wrappers in their totality of the circumstances analysis: "[R]emnants from fast-food restaurants can probably be found on the floor of many cars traveling the interstate highways," and therefore, the possession of "vestiges of fast-food meals describes a very large category of presumably innocent travelers . . . and any suspicion associated with these items is virtually non-existent." 106 F.3d at 947. The court ultimately of course found that the government did not establish reasonable suspicion with food wrappers and nervousness. *Id. at 948.*

In *United States v. Smith*, 263 F.3d 571 (6th Cir. 2001), food wrappers were again discussed: "The food wrappers, soda cans and cooler in the vehicle are factors which have been given little, if any, weight by other courts considering the question of reasonable suspicion, ... " *Id*. at 594. The *Smith* court also considered the suspect's "nervousness during questions about narcotics and weapons" and found that it "appears that the officer, whose primary duty was drug interdiction, may have identified a vehicle and occupants which fit a profile, and based on that, detained Steven after the completion of the traffic stop without developing a reasonable, articulable suspicion of criminal activity." *Id.* Likewise is probably true in the present case.

In any case, the *lack* of food wrappers in a rental vehicle stopped in Nebraska and traveling from Illinois, is probably a factor that should be "outrightly dismissed," because it is "so innocent or susceptible to varying interpretations as to be innocuous." *Wood, 106 F.3d at 946.*

Both *Wood* and *Smith* are just two examples of where the government attempted to establish reasonable suspicion on nervousness and speculation about food wrappers. Such weak evidence would describe a large amount of "presumably innocent travelers, who would be subject

11

to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Reid v. Georgia*, 448 U.S. 438, 441 (1980).

Furthermore, it would be the height of absurdity for law enforcement to suggest that both the **presence of** and **lack of** food wrappers on the floor of a vehicle give rise to any reasonable suspicion of criminal activity. That, of course, would make each and every traveler on the highways suspicious, a goal not yet achieved in American jurisprudence.

Clearly, any lack of food wrappers or alleged nervousness does not individually or collectively give rise to reasonable suspicion of any crime, let alone the crime of drug trafficking.

> **2.** **A Reasonable Person Would Not Have Felt Free To Leave and Ignore the Police Presence After Deputy Vance Handed Claimant A Warning For Speeding**

Plaintiff's only remaining justification for the search of Claimant's vehicle and luggage is the allegation that Claimant submitted to additional questioning after being issued a warning citation and then consented to a search of his vehicle. However, because Claimant was illegally seized at the time deputies began interrogating him for drug trafficking, any consent to answer additional questions was the fruit of an illegal seizure, and must be suppressed.

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Whether one is "seized" is a fact intensive, totality of the circumstances test, to be done on a case-by-case basis, and "is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that

12

conduct in isolation." See *United States v. Griffith*, 2008 U.S. App. LEXIS 15387, *7 (8th Cir.

2008) (citing *Michigan v. Chesternut,* 486 U.S. 567, 573 (1988)).

> Some circumstances which inform our decision-making include: officers **positioning themselves in a way to limit the person's freedom of movement**, *United States v. White, 890 F.2d 1413, 1416 (8th Cir. 1989)*, **the presence of several officers**, the display of weapons by officers, physical touching, the use of **language** or intonation **indicating compliance is necessary**, the officer's retention of the person's property, or an **officer's indication the person is the focus of a particular investigation** [citations omitted]

> See *United States v. Griffith*, supra, *7 (emphases added)

Here, and as will be discussed more thoroughly in <u>section C</u>, *infra*, the circumstances and

coercive effect of the law enforcement presence in the present case warrant a finding that

Claimant was illegally seized at the time he was handed a copy of the warning for speeding and

interrogated for narcotics activity. At that time, the three uniformed and armed deputies

(investigating one citizen for speeding) positioned themselves around Claimant so that he was

surrounded on all four sides by law enforcement (a patrol car on one side and deputies on the

remaining three sides), and thereby limited his movement. Claimant was pulled over by the third

patrol car who observed him within minutes (the first one followed alongside Claimant's vehicle

for 15-20 seconds and pointed a strange device at him, before speeding off). The deputies actions

indicate that Claimant was the focus of particular investigation, and go far beyond what any

average citizen would expect from being stopped and issued a *warning* for speeding.  Further,

Claimant was ordered out of his vehicle, surrounded by three uniformed, armed and large

deputies, told "I need you to sign" a warning citation.  The actions and language of the deputies

strongly suggested that compliance was mandatory.

13

Plaintiff will likely argue that because deputies requested and Claimant agreed to answer some more questions after the warning citation was issued, that the entire encounter was consensual. However, as will be discussed *infra*, "requests" by law enforcement officers are not always requests, (see *United States v. Alvarez-Manzo, 2008 U.S. Dist. LEXIS 55662* (D. Neb. July 3, 2008)) and even a consensual encounter will turn into a Fourth Amendment seizure with a show of authority and interrogation. See *United States v. Millan*, 912 F.2d 1014, 1016-7 (8th Cir. 1990) ("Millan argues, and we agree that the consensual encounter turned into a Fourth Amendment seizure when Hicks showed Millan his badge for the second time and began questioning Millan about drugs.")[2]

"[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari,* 499 U.S. 621, 628 (1991).

In *Millan*, a DEA agent engaged in a consensual encounter with Millan after observing that Millan matched a drug courier profile. Millan said that he was visiting his cousin but couldn't remember his cousin's address or telephone number, and the agent observed a bulge in Millan's jacket pockets that the agent suspected of being narcotics. The agent showed Millan his badge for a second time, began asking Millan if he was transporting drugs, and asked for consent

---

[2] See also *United States v. Nunley*, 873 F.2d 182, 184-85 (8th Cir. 1989) (consensual encounter turned into a seizure when the agent told the defendant he was there to stop the flow of drugs through the airport); *United States v. Sadosky,* 732 F.2d 1388, 1392-93 (8th Cir. 1984) (consensual encounter became a seizure when the agent revealed he was investigating narcotics violations and wanted to question the defendant because of his unusual behavior), *cert. denied*, 469 U.S. 884, 83 L. Ed. 2d 191, 105 S. Ct. 254 (1984).

14

to search his luggage. *Id*. at 1016. Because the court held that the agent did not have reasonable suspicion of drug trafficking, Millan was held to have been seized at the point that the agent showed his badge and began questioning him about drugs. The court reversed the district court's denial of Millan's motion to suppress. *Id*. at 1018. Here, like in *Millan*, deputies lacked reasonable suspicion (See <u>section B, sub. 1</u>, *supra*) of drug trafficking at the time that issued a warning citation for speeding, and once they surrounded him and began questioning Claimant about transporting drugs, he was illegally seized.

Moreover, a second investigative stop is "inherently more intrusive and coercive than the first." See *United States v. Ilazi,* 730 F.2d 1120, 1126 (8th Cir. 1984). Claimant was, or at the very least, had just been, initially detained.  Therefore, after issuing Claimant a warning for speeding, the deputies, by interrogating him regarding illegal narcotics, *again* seized him by extending the traffic stop in an unreasonable fashion.  Because the deputies did not have reasonable and articulable suspicion of any criminal activity, this second seizure was illegal, and the consent and search that followed was tainted by the seizure's illegality.

**C.     Any Consent By Claimant To Search The Vehicle Was Not Freely and Voluntarily Given and Does Not Validate the Warrantless Search of Claimant's Luggage**

Even if this court were to find that the traffic stop and subsequent seizure of Claimant was lawful, the warrantless search of Claimant's vehicle must still fail, as it was the result of coercion and was not voluntarily given. For "a warrantless search premised on consent to be valid, the government **must** show that the consent was freely and voluntarily given--a factual question to be determined by the totality of the circumstances." *McGann v. Northeast Ill. Regional Commuter*

15

*R.R. Corp.*, 8 F.3d 1174, 1178 (7th Cir. 1993) (emphasis added) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). "The government bears the burden to prove by a preponderance of the evidence that consent to search was freely given. *United States v. Smith*, 260 F.3d 922, 924 (8th Cir. 2001) (citing *United States v. White,* 81 F.3d 775, 780 (8th Cir. 1996))." *United States v. Alvarez-Manzo*, 2008 U.S. Dist. LEXIS 55662, *23 (D. Neb. July 3, 2008).

 The warrantless search is not justified where Plaintiff is unable to demonstrate that valid consent was given.  Plaintiff, therefore, has the burden of proving that Claimant's "consent, if such consent exists, was, in fact, freely and voluntarily given." See *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). Moreover,

> ... we should point out that consents to search are carefully examined for evidence of coercion or duress. This is particularly true in the absence of a written waiver or warnings concerning Fourth Amendment rights. See *United States v. Nikrasch*, 367 F.2d 740, 744 (7th Cir. 1966); *Porter v. Ashmore*, 298 F. Supp. 951, 955 (D.S.C. 1969), rev'd on other grounds, 421 F.2d 1186 (4th Cir. 1970), cert. denied, 402 U.S. 981, 91 S. Ct. 1644, 29 L. Ed. 2d 146 (1971); cf. *United States v. Miller*, 395 F.2d 116, 118 (7th Cir.), cert. denied, 393 U.S. 846, 89 S. Ct. 132, 21 L. Ed. 2d 117 (1968). But see *Byrd v. Lane*, 398 F.2d 750, 754-755 (7th Cir. 1968), cert. denied, 393 U.S. 1020, 89 S. Ct. 625, 21 L. Ed. 2d 564 (1969); *Gorman v. United States*, 380 F.2d 158, 164 (1st Cir. 1967).
>
> Courts have not looked with favor on the practice of substituting consent for the authorization of a search warrant.
>
> *United States v. Dichiarinte*, 445 F.2d 126, n.1 (7th cir. 1971)

 Plaintiff's obligation in this regard has been called a "heavy burden" by the Ninth Circuit Court of Appeals.  See *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997), *citing Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).

Moreover, Plaintiff bears the burden of showing, by a preponderance of the evidence, both that such consent was freely and voluntarily given **and** that the search did not exceed the scope of that consent. *See United States v. Matlock*, 415 U.S. 164, 171 (1974).

### 1.    Claimant's Consent To Search the Vehicle Was Not Freely and Voluntarily Given

Courts in the Eighth Circuit tend to divide the analysis of consent searches into two aspects: (1) characteristics of the person from whom consent was allegedly obtained, and (2) the environment in which the alleged consent was given.

In the context of consent, in evaluating the characteristics of one claiming a Fourth Amendment violation, courts look to factors such as "the party's age, intelligence and education, whether he was under the influence of drugs or alcohol**, whether he was informed of his right to withhold consent**, **and whether he was aware of rights afforded criminal suspects.**" *United States v. Almendares*, 397 F.3d 653, 660 (8th Cir. 2005) (emphases added). Also, "whether the defendant's contemporaneous reaction to the search was consistent with consent." *United States v. Jones*, 254 F.3d 692, 696 (8th Cir. 2001).

Here, claimant was never informed of his right to withhold consent, **and** he was unfamiliar with the criminal justice system at the time of the stop - a fact assuredly known by both Claimant and the officers at the time of the alleged consent, as evinced by Claimant's declaration (*Exhibit A*: 2) and, as will surely be conceded by the government, no criminal history of Claimant was discovered by the officers. Moreover, immediately after giving his alleged "consent," Claimant was put in handcuffs and forced inside of a patrol vehicle – conduct wholly

17

inconsistent with any consensual interaction. All of the above factors weigh in favor of finding that any alleged consent was not voluntarily given.

Additionally, courts must "consider the environment in which the alleged consent took place," and take into account factors including "the **length of time** he was **detained**, ... whether the police ... **physically intimidated** ... him; ... whether he was **in custody** or under arrest when the consent was given; []whether the consent occurred in a public or a **secluded place**; and [] whether he stood by silently . . . as the search occurred." See *United States v. Smith*, 260 F.3d 922, 924 (8th Cir. 2001) (emphases added). The factors should not be applied mechanically, and no single factor is dispositive or controlling." *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000).

Here, the environment was extremely coercive and shows that Claimant did not give free and voluntary consent. First, Claimant was physically intimidated at the time the alleged consent occurred, for several reasons. Claimant was pulled over by the third marked patrol car that Claimant knew had observed him within only a few minutes, and the first patrol car pointed some strange device at him and drove parallel to his vehicle for some 15-20 seconds before speeding off. When pulled over by the third patrol car, he was not told the reason, and believed he had been driving within the posted speed limit. (*Exhibit A*: 5-8). Furthermore, at the time of the alleged consent, Claimant was surrounded by three uniformed and armed officers. See *United States v. Jefferson*, 906 F.2d 346, 350 (8th Cir. 1990) (stating that officers in uniform "would appear to exert more authority over defendants.").

During the time in which his license was being ran, Claimant was watched in close proximity by a second uniformed officer who had her hand on her weapon. (*Exhibit B*). After a

18

few minutes, Claimant was then ordered out of the vehicle and immediately saw that a third uniformed officer had arrived at the scene. When one of the officers began walking towards Claimant's rental vehicle to obtain the VIN number, he told Claimant "stay right there" while pointing toward the front of the patrol car. At that time, the third officer began interrogating Claimant, and apparently was openly suspicious of some of Claimant's responses. "The combined actions by ... " the deputies " ... went well beyond what an average citizen would expect from [the stop]." *U.S. v. Jefferson, supra*, at 350.

Moreover, this intimidation took place in a secluded, uncomfortable and non-public place where no one could hear the interaction between Claimant and deputies. Claimant was on the side of an interstate on a windy and cold day. While other citizens could possibly see the interaction for a brief moment while they drove by at 75 miles per hour, it was not possible that anyone, other than Claimant and the three uniformed and armed officers, could hear and observe the goings on with any significance.

Next, Claimant was being detained and in custody for a traffic violation at this time of great intimidation, and, immediately after being told, "I need your signature" by Deputy Vance, Claimant was asked about whether he had firearms, illegal narcotics, or large amounts of U.S. currency. After Claimant responded in the negative, and before Claimant had a chance to even begin walking away, Claimant was asked if deputies could search his vehicle. (*Exhibit B*).

At this point, Claimant was surrounded by three uniformed and armed deputies that were all visibly and significantly larger than him. The only side of Claimant not blocked by officers was, itself, blocked by a patrol car. No reasonable person would have felt free to leave or otherwise ignore the police presence under such circumstances. Indeed, in *U.S. v. Jefferson,*

19

*supra*, 906 F.2d at 350 (in finding a seizure illegal), the court found that "an interstate rest area in the early morning created a much more isolated environment than" an airport concourse. The *Jefferso*n court discussed how, because the defendant was initially in an arrangement that may have prevented him from moving his car, the fact that the trooper moved him to within the patrol car that was "police property" and more "enclosed," exacerbated the authoritarian and non-consensual nature of the interaction. The court distinguished the facts of that case from an earlier case where questioning took place in a "well-populated public area" by noting that the above mentioned factors contributed to the finding that the rest area was a "more isolated and confined setting," and thus turned a consensual encounter into a seizure because the defendant would not feel free to leave or ignore the police presence. See *id.* Here, an average person in Claimant's shoes would have felt confined, isolated and intimidated, as did the defendant in *Jefferson*.

Claimant had also been detained for a period of over ten minutes and ordered out of his vehicle to be issued a *warning* for speeding. Surrounded by an intimidating, demanding, and overwhelming law enforcement presence on a cold and windy day on the side of an interstate highway, Claimant hesitantly responded to Deputy Vance's "request" for consent by saying: "If you'd like to, uh, I guess that's fine," while shrugging his shoulders. Such a response, under the circumstances of this case, clearly does not constitute a voluntary consent to search that was free from coercion.

Here, like in the recent case of *United States v. Alvarez-Manzo, supra,* "Given the coercive nature of the interaction between the officers and the defendant, the court finds that the defendant did not voluntary give his consent to search ... " *Id.* at *24. The court there held so because it was obliged to "inquire 'whether the officers did anything to affirmatively communicate to the

20

defendant that she was free to terminate the encounter or to refuse the consent request[,]'" (citing *United States v. Zamoran-Coronel*, 231 F.3d 466, 469 (8th Cir. 2000), and the "officers' conduct repeatedly showed Alvarez-Manzo that he had no choice but to comply with their 'requests' and that he was not free to terminate the encounter." *Id.* at *20-21. Officers there "requested that the defendant **leave the bus** to discuss the luggage. The defendant **was not given the option to remain on the bus** and have his luggage returned to him. When they exited the bus, they were **joined by a second officer**. The officer continued to maintain custody of the luggage and **questioned the defendant regarding his itinerary**[,]" (*Id.* at 21-22) and the officers' "behavior demanded an answer to their question[s]". *Id.*

All of those factors are present here, Claimant was ordered out of the car, not given an option to remain, and interrogated about his itinerary once out, like in *Alvarez-Manzo*. Here, there was much more: upon exiting his vehicle, Claimant was surrounded closely by three uniformed and armed deputies. In *Alvarez-Manzo,* there were only two **plain clothed** officers (see *id.* n.2 at *4), and one of them was "nearby." (See *id.* n.2 at *6). Moreover, Alvarez-Manzo was told that he was "not under arrest or in **any** kind of trouble" (See *Id.* n.2 at *7) and the interrogation took place in a busy bus depot, only six feet from the door of the bus, presumably in easy view of many people. Here, Claimant was on a cold and desolate shoulder of an interstate, no one could see or hear the interaction with law enforcement, he had been investigated for a traffic violation, he was surrounded by three uniformed officers, he was being interrogated apparently for a narcotics offense, and he was **never** advised that he could refuse the request for consent.

It should finally and again be noted that a second consecutive investigative stop is "inherently more intrusive and **coercive** than the first." See *United States v. Ilazi, supra*, 730 F.2d

21

at 1126 (emphasis added). Plaintiff cannot satisfy its heavy burden of showing that any consent on the part of Claimant was freely and voluntarily given in the present case.

### 2.    Officers Never Requested Nor Obtained Consent To Search Claimant's Luggage

Even if this court somehow finds that the consent Claimant gave deputies to search his rental vehicle was free and voluntary, the search of Claimant's luggage is still illegal, as it was never consented to by Claimant.

It is clear law that if an officer obtains "consent to search the car, the officer also obtained consent to search a closed container in that car, **provided that it was objectively reasonable for the officer to believe that [] consent extended that far and that the closed container might be concealing drugs**." *United States v. Hammons*, 152 F.3d 1025 (8th Cir. 1998) (citing *Florida v. Jimeno,* 500 U.S. 248, 251-52 (1991)).

Deputy Mike Vance only asked if Claimant minded if he searched the "vehicle." Claimant was never asked and never consented to the search of the trunk, but more importantly, never consented to the search of his luggage within that trunk. Claimant told Deputy Brown that he had a laptop computer and luggage with him, and then Deputy Vance immediately asked if Claimant minded if he could search the rental "vehicle". In *Hammons, supra*, the court noted that "the officer could not reasonably believe that Mrs. Hammons' consent to search the car extended to the envelope [within a garment bag]. The officer needed to obtain the defendant's consent to open the envelope ... " 152 F.3d 1025 at 1028. There, like here, law enforcement could not have reasonably believed that Claimant's consent to search a rental **vehicle** extended to searching through his

22

personal belongings that were contained within his closed luggage that was, itself, within the trunk of the vehicle.

"The touchstone of the *Fourth Amendment* is reasonableness." *Jimeno, supra, 500 U.S. at 250*. It is highly suspicious and wholly unreasonable that immediately after obtaining "consent" to search the rental vehicle, deputies not only ordered Claimant away from sight of the search and into the patrol car, but also put him in handcuffs without taking a moment to advise him of any of his rights to refuse consent, or clarify that they wished to search his luggage.  Such actions clearly demonstrate that deputies did not objectively believe that consent extended to the search of the luggage. The actions convey the message that deputies wanted to create a situation where withdrawing consent or objecting to the search of the trunk or the luggage therein would be unrealistic for Claimant. This invalidates any consent to search, certainly invalidates the search of Claimant's luggage, is clearly illegal, and will be discussed more thoroughly, *infra*.

> 3. **Assuming, Arguendo, that Claimant's Consent Was Voluntary and Encompassed the Search of His Luggage, the Search and Evidence Obtained Was Tainted by His Subsequent Illegal Detention**

Even if this court were to find that the actions of the deputies were somehow reasonable up to the point that Claimant was asked and gave "consent," the subsequent actions of the deputies still invalidate the search of Claimant's luggage.

In *United States v. $ 25,000 U.S. Currency,* 853 F.2d 1501, 1506 (9th Cir. 1988), the Ninth Circuit Court reasoned that even if a suspect had voluntarily consented to a search of his bag, law enforcement officers could still have "seized [him] for purposes of the *fourth amendment* **at a later point**" (emphases added).  In *United States v. Washington*, 490 F.3d 765 (9th Cir.

2007), that court again stated that if officers' "actions exceeded the scope of Washington's consent to the search of his person, such that a reasonable person in Washington's situation would not have felt free to depart if he so chose, then Shaw and Pahlke seized Washington." *Id*. at 771 (*Citing Terry v. Ohio*, 392 U.S. 1, 18 (1968) (recognizing that "a search which is reasonable at its inception may violate the *Fourth Amendment* by virtue of its intolerable intensity and scope")). Even if Claimant's consent was valid and encompassed the consent to search his luggage, deputies' subsequent actions could have, and did, constitute a seizure in violation of the Fourth Amendment.[3]

Here, even assuming a coerced consent to search his rental vehicle, Claimant was then ordered further away from his vehicle, handcuffed, and made to sit inside a patrol vehicle. It cannot seriously be argued that a reasonable person in Claimant's position would have felt free to depart if he so chose at that point. Moreover, all of the above factors regarding the coerciveness of the consent still apply and weigh for a finding that an illegal seizure occurred.

In *Washington, supra*, "[p]erhaps most important" to the court's holding that Washington was seized after a consent search: "the manner in which Shaw searched Washington's person was authoritative and implied that Washington 'was not free to decline his requests[,]'" (citations omitted), "Hence, the consensual search by Shaw had escalated to a seizure of Washington, whereby Washington could do nothing more than comply with Shaw's orders." *Id.* at 772-3.

> ... Pahlke's position during Shaw's search of Washington's person weighs in favor of finding a seizure. After Washington exited his car and began following Shaw's directions to move away from it and towards Shaw's squad car, Pahlke positioned

---

[3] Such is well established law within the 8th circuit: *see e.g. U.S. v. Millan, U.S. v. Nunley, and U.S. v. Sadosky, supra*, holding that consensual encounters can turn into seizures at a later point.

himself between Washington and his car. If Washington wanted to end his encounter with Shaw and Pahlke and leave, he would have had to either: (a) **leave on foot**, abandoning his unlocked car, with the driver's door partially open; or (b) **navigate through or around** Pahlke **to get back into his car. Neither option was realistic, especially considering Pahlke and Shaw outnumbered and outsized Washington.** *See United States v. Berry, 670 F.2d 583, 597 (5th Cir. 1982)* (stressing that "blocking an individual's path or otherwise intercepting him to prevent his progress in any way is a consideration of great, and probably decisive, significance" in favor of finding a seizure).

*U.S. v. Washington,* 490 F.3d 765 at 773

The *Washington* court thereby found, under the totality of the circumstances, that

… **a reasonable person would not have felt free to disregard** Shaw's **directions**, **end the encounter** with Shaw and Pahlke, and **leave the scene**. *See Royer, 460 U.S. at 501-02* (holding a seizure occurred when the defendant was asked by law enforcement officers to relocate to a police room without being told he was free to depart); *Washington, 387 F.3d at 1064, 1068-69* (concluding a seizure occurred when the defendant and his companion were engaged by six officers in an outdoor hallway outside of his motel room, the officers moved the defendant "twenty to thirty feet away from his door," and the officers never informed the defendant that he had a right not to respond to their questions and terminate the encounter). We hold that Shaw and Pahlke exceeded the scope of Washington's consent to search his person and seized him.

*U.S. v. Washington*, 490 F.3d 765 at 774

Washington stands for the principle that a consent search can escalate into an illegal and unreasonable Fourth Amendment seizure. In *Washington*, *supra,* the suspect consented to a search of his person and the officers exceeded the scope of that consent by the manner in which they conducted that search. Here, assuming arguendo, that Claimant consented to the search of his vehicle and luggage, the deputies exceeded the scope of that consent by the manner in which they conducted that search: by essentially arresting Claimant, detaining and confining him within sheriff's property (the patrol car). The above circumstances beg the question: if the search was

25

premised on consent, how could Claimant have objected, withdrawn consent or ended the encounter from the position of being handcuffed in the back of his police car. It is absurd to argue that a reasonable person in Claimant's position would have felt free to leave. Claimant was illegally seized in violation of the Fourth Amendment and the search of his luggage was made without his consent.

### III.     DEPUTIES UNLAWFULLY ARRESTED CLAIMANT IN VIOLATION OF THE FIFTH AMENDMENT

A warrantless arrest must be supported by probable cause and "depends . . . upon whether, **at the moment** the arrest was made, . . . the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91 (1964). *See also Kuehl v. Burtis*, 173 F.3d 646 (8th Cir.1999); *United States v. Neumann,* 585 F.2d 355 (8th Cir. 1978).

"A *Miranda* warning must precede any custodial interrogation. A custodial interrogation involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *United States v. Chamberlain,* 163 F.3d 499, 502 (8th Cir.1999) (citing *Miranda v. Arizona,* 384 U.S. 436 (1966)).

Here, Claimant was put into handcuffs and put in a patrol car, thus, he was clearly in custody.  This act of physical force and display of authority came after and in response to Claimant being interrogated about whether he had illegal narcotics, currency or firearms, and such interrogation continued after Claimant was handcuffed. Deputies clearly had less than reasonable

26

suspicion (see <u>Section II (B)(1)</u>, *supra*) and the arrest was illegal. Claimant was never given Miranda warnings or otherwise advised of his rights, despite the fact that deputies knew he had no criminal history. All statements made after being placed in handcuffs, are inadmissible at trial, including all statements made at the sheriff's station.

### IV.    <u>ALL EVIDENCE OBTAINED AS A RESULT OF THE UNLAWFUL WARRANTLESS SEARCH IS THE "FRUIT OF THE POISONOUS TREE" AND VIOLATED THE FIFTH AMENDMENT; AND MUST BE SUPPRESSED</u>

The exclusionary rule operates to prevent the use of evidence obtained as the indirect product of unlawful conduct in the same manner that it precludes the use of evidence directly obtained by improper conduct. *Segura v. United States*, 468 U.S. 796, 804 (1984). This principal has become established as the "fruit of the poisonous tree" doctrine. *Wong Sun v. United States*, 371 U.S. 471 (1963). In the instant case, law enforcement conducted an illegal warrantless search of Claimant's rental vehicle, the trunk of that vehicle, and his luggage. Accordingly, all evidence, direct or indirect, adduced as a result of the Fourth Amendment violations must be suppressed.

"The question in a ['fruit of the poisonous tree'] case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (internal quotation marks omitted)) *Wong Sun v. United States*, 371 U.S. 471, 488, (1963); *see also Royer,* 460 U.S. at 501.

Additionally, and pursuant to the Fifth Amendment, any and all statements and evidence obtained as a result of Claimant's illegal warrantless arrest should be deemed inadmissible.

//

## **CONLUSION**

Deputies here were on "on a fishing expedition 'in the hope that something [illegal] might turn up.'" *United States v. Washington, supra*, 490 F.3d 765, 777 (citing *Brown, 422 U.S. at 605)*. It is respectfully requested that this court place its stamp of disapproval on the inappropriate police action, suppress all evidence of the illegal seizure, search and arrest, dismiss the action, and order the return of defendant property to Claimant.

Respectfully submitted,

Dated: 12 September 2008

s/DAVID M. MICHAEL_____
DAVID M. MICHAEL
California State Bar No. 74031
Law Offices of David M. Michael
101 California Street, Suite 2450
San Francisco, CA 94111
Telephone: (415) 946-8996
Facsimile:  (877) 538-6220
dmmp5@aol.com

Attorney for Claimant
BARTOSZ MAREK KUPCZYK

## CERTIFICATE OF SERVICE

I hereby certify that, on 12 September 2008, I caused to be electronically filed the

foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of

electronic filing to the following:

AUSA Nancy A. Svoboda
Office of the District Attorney
District of Nebraska
1620 Dodge Street, Suite 1400
Omaha, Nebraska 68102-1506
Nancy.Svoboda@usdoj.gov

Dated: 12 September 2008

s/DAVID M. MICHAEL_____
DAVID M. MICHAEL
California State Bar No. 74031
Law Offices of David M. Michael
101 California Street, Suite 2450
San Francisco, CA 94111
Telephone: (415) 946-8996
Facsimile:   (877) 538-6220
dmmp5@aol.com

Attorney for Claimant
BARTOSZ MAREK KUPCZYK